[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUL 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11682

_____

FCC No. 98-00170

NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER
ADVOCATES,

Petitioner,

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS,

Intervenor-Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION,

Respondent,

AT&T CORPORATION,
CINGULAR WIRELESS, INC.,
LEAP WIRELESS INTERNATIONAL, INC.,
NEXTEL COMMUNICATIONS, INC.,
SPRINT CORPORATION,
T-MOBILE USA, INC.,
VERIZON,
CELLULAR TELECOMMUNICATIONS and INTERNET
ASSOCIATION,

Intervenors-Respondents.

_____

No. 05-12601

_____

FCC No. 98-00170

VERMONT PUBLIC SERVICE BOARD,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION,

Respondent.

_____

Petitions for Review of Decisions of the
Federal Communications Commission

_____

**(July 31, 2006)**

Before BLACK, PRYOR and COX, Circuit Judges.

PRYOR, Circuit Judge:

The key issue presented in this petition for review is whether the Federal

Communications Commission exceeded its authority, under section 332(c)(3)(A)

of the Communications Act of 1934, when it issued an order that preempted the

states from requiring or prohibiting the use of line items in customer billing for

cellular wireless services.  47 U.S.C. § 332(c)(3)(A); see Truth-in-Billing and

Billing Format, Nat'l Ass'n of State Util. Consumer Advocates' Petition for Declaratory Ruling Regarding Truth-in-Billing, 20 F.C.C.R. 6448 (2005) [hereinafter "Second Report and Order" or "the Order"].  The Commission argues, on the one hand, that the regulation of line-item billing involves "rates charged" for cellular wireless services, which is the exclusive province of federal regulation. 47 U.S.C. § 332(c)(3)(A).  Representatives of state interests argue, on the other hand, that the regulation of line-item billing involves "other terms and conditions" of cellular wireless services, which are regulable by the states.  Id.

This appeal also addresses three threshold issues: (1) whether, under the Hobbs Act, 28 U.S.C. § 2344, this Court lacks subject matter jurisdiction to review the petition filed by the Vermont Public Service Board (the Vermont Board); (2) whether the National Association of Regulatory Utility Commissioners (the State Utility Regulators) may participate as an intervenor; and (3) whether the National Association of State Utility Consumer Advocates (the State Consumer Advocates) has standing to petition for review.  As to the threshold issues, we dismiss the petition of the Vermont Board because it is not a "party aggrieved" by the Second Report and Order, but we allow the State Utility Regulators to continue as an intervenor and deny the motion to dismiss the petition of the State Consumer Advocates, which have standing as a consumer of wireless service.

On the key issue, we grant the petitions for review because we conclude that the Commission exceeded its authority when it preempted the states from requiring or prohibiting the use of line items. The scope of federal authority to regulate "rates" or "entry" does not include the presentation of line items on cellular wireless bills. 47 U.S.C. § 332(c)(3)(A). This billing practice is a matter of "other terms and conditions" that Congress intended to be regulable by the states. Id.

## I. BACKGROUND

The State Consumer Advocates filed a petition with the Commission that requested a prohibition on the use of line items by cellular wireless carriers unless the line item is mandated by state or federal law. In response to this petition, the Commission issued an order that amended the Truth-in-Billing Rules of the Commission, preempted the states from requiring or prohibiting the use of line items in customer billing for wireless service, and proposed further rulemaking to preempt the states from the regulation of billing practices of wireless service providers. The State Consumer Advocates and the Vermont Board petition for review of the Order by the Commission. Sprint Nextel Corp. and Cingular Wireless LLC (collectively, the Carriers) intervene in support of the Commission, and the State Utility Regulators intervene in support of the Vermont Board.

To explain the context of this appeal, we address three preliminary matters.

4

We first describe the enactment and amendment of the Communications Act and the promulgation of the Truth-in-Billing Rules. We next discuss the petition for declaratory ruling filed by the State Consumer Advocates and the Second Report and Order issued by the Commission in response to that petition. We then discuss motions filed by the Carriers and the Commission to dismiss the petitions of the Vermont Board and the State Consumer Advocates.

*A. The Communications Act of 1934 and the Truth-in-Billing Rules*

The Communications Act of 1934, 47 U.S.C. §§ 151 to 615b, was enacted "for the purpose of regulating interstate and foreign commerce in communication by wire and radio." Id. § 151. The Act vested the Commission with the authority to regulate radio frequencies used in wireless services. Id. § 303. In 1993, Congress amended the Communications Act to create a new regulatory class called "commercial mobile radio service," which is "any mobile service [] that is provided for profit and makes interconnected service available [] to the public or [] to such classes of eligible users as to be effectively available to a substantial portion of the public." Id. § 332(d)(1). The amendment granted the federal government exclusive authority to regulate the "rates charged" and "entry" of wireless carriers. See id. § 332(c)(3)(A). Although the states were prohibited from regulating "rates" or "entry," the amendment provided that the states could

5

continue to regulate "other terms and conditions" of wireless service. Id. §

332(c)(3)(A).

In May 1999, in response to a growing concern with consumer fraud in the

provision of telecommunications services, the Commission promulgated the Truth-

in-Billing Rules. In the Matter of Truth-in-Billing and Billing Format, 14 F.C.C.R.

7492 (1999) [hereinafter "First Report and Order"]. The stated purpose of the

Rules was "to ensure that consumers are provided with basic information they need

to make informed choices in a competitive telecommunications marketplace, while

at the same time protecting themselves from unscrupulous competitors." Id. at

7493–94. The Truth-in-Billing Rules required consumer telephone bills to (1) "be

clearly organized, clearly identify the service provider, and highlight any new

providers"; (2) "contain full and non-misleading descriptions of charges"; and (3)

"contain clear and conspicuous disclosure of any information the consumer may

need to make inquiries about, or contest charges, on the bill." Id. at 7496 ¶ 5.

The Commission exempted wireless service providers from several of these

rules, id. at 7501–02 ¶¶ 13–19, but the Commission required, among other things,

"(1) that the name of the service provider associated with each charge be clearly

identified on the bill; and (2) that each bill should prominently display a telephone

number that customers may call free-of-charge in order to inquire or dispute any

charge contained on the bill." Id. at 7502 ¶ 15. The Commission sought further comment on whether the Truth-in-Billing Rules should be applied to wireless service providers. Id. at 7535 ¶ 68.

*B. The State Consumer Advocates and the Second Report and Order*

The State Consumer Advocates "are state agencies designated by laws of their respective jurisdictions to represent the interests of utility consumers before regulatory agencies and in the courts." The State Consumer Advocates petitioned the Commission for a declaratory ruling that prohibited wireless telecommunications carriers "from imposing any separate line item or surcharge on a customer's bill that was not mandated or authorized by federal, state or local law." Second Report and Order, 20 F.C.C.R. at 6449 ¶ 1. A line item is "a discrete charge identified separately on an end user's bill." Id. at 6462 ¶ 30. According to the State Consumer Advocates, the use of line items that were not required by federal or state law violated the Truth-in-Billing Rules and the Communications Act because these line items "do not allow customers to accurately assess what they are being billed for or permit customers to determine whether the amounts charged conform to the price charged for service." Id. at 6454 ¶ 13 n.32.

In response to the request for a declaratory ruling filed by the State Consumer Advocates, the Commission issued a notice that solicited comments

7

regarding the petition. The notice stated that the Commission "seeks comment," about whether telecommunications carriers should be prohibited from "imposing monthly line-item charges, surcharges or other fees on customers bills unless such charges have been expressly mandated by a regulated agency." Nat'l Ass'n of State Util. Consumer Advocates' Petition for Declaratory Ruling Regarding Truth-in-Billing, 19 F.C.C.R. 9541 (2004) (public notice). Comments were submitted by wireless carriers, the State Utility Regulators, the State Consumer Advocates, and individual consumers. Many consumers submitted brief comments that expressed confusion and dissatisfaction with their monthly telephone bills.

After the public comment period closed, during the so-called "permit but disclose" proceedings, see 47 C.F.R. § 1.1206, the Commission received ex parte presentations and letters. On March 3, 2005, the State Utility Regulators provided notice of oral and written ex parte communications with the members of the Commission. Also on March 3, the Vermont Board sent an ex parte letter addressed to the five members of the Commission. On March 4, the permit-but-disclose period closed, and communications with the Commission were no longer permitted. See id. § 1.1203. On that date, the Vermont Board electronically filed notice of the ex parte letter it had sent on March 3, but the Clerk of the Commission excluded the letter because it "was received during the Sunshine

8

Agenda period, and is associated with, but not made part of the record."

On March 18, 2005, the Commission issued its conclusions in an Order that addressed three issues. First, in a "Second Report and Order," the Commission amended or clarified the Truth-in-Billing Rules and applied these rules to wireless service providers. Second Report and Order, 20 F.C.C.R. at 6454–58 ¶¶ 14–20. Second, in a "Declaratory Ruling," the Commission denied the petition filed by the State Consumer Advocates and preempted the states from requiring or prohibiting the use of line items on monthly telephone bills by wireless service providers. Id. at 6458–6467 ¶¶ 21–36. Third, the Commission requested a "Second Further Notice of Proposed Rulemaking" that proposed to adopt new rules in the billing practices of wireless service providers. Id. at 6467–6478 ¶¶ 37–57.

As to the first issue, the Commission reviewed the history of the Truth-in-Billing Rules and concluded "that [wireless service providers] should no longer be exempt from [the] requirement that billing descriptions be brief, clear, non-misleading and in plain language." Id. at 6456 ¶ 16; see also 47 C.F.R. § 64.2401(b). The Commission found that "the increasing number of consumer complaints to this Commission and state regulatory agencies regarding wireless billing practices provides empirical evidence that application of the truth-in-billing rules to [wireless service providers] is necessary and in the public interest."

9

Second Report and Order, 20 F.C.C.R. at 6457 ¶ 18. The Commission "emphasize[d]" that the application of the truth-in-billing rules to wireless service providers did not "limit[] states' authority to enforce their own generally applicable consumer protection laws, to the extent such laws do not require or prohibit use of line items." Id. at 6458 ¶ 20.

As to the second issue, the Commission denied the petition filed by the State Consumer Advocates because "nothing in the Truth-in-Billing Order prohibits carriers from using non-misleading line items." Id. at 6458–59 ¶ 23. Although the Commission found that consumers and state regulatory agencies were confused about the use of line items, the Commission "recognize[d] that overbroad state regulations . . . may frustrate our federal rules and the federal objective of minimizing regulatory burdens on the competitive [wireless service provider] industry." Id. at 6459–60 ¶ 24. The Commission stated that "it is permissible for carriers to recover [regulatory] costs so long as they do so in a manner that complies" with the Truth-in-Billing Rules, but "it is a misleading practice for carriers to state or imply that a charge is required by the government when it is the carriers' business decision as to whether and how much of such costs they choose to recover directly from consumers through a separate line item charge." Id. at 6460–61 ¶¶ 26–27.

The Commission also concluded that "state regulations requiring or prohibiting the use of line items . . . constitute rate regulation and . . . are preempted under section 332(c)(3)(A)" of the Act.  Id. at 6462 ¶ 30.  The Commission explained that "rates," included "rate levels," "rate structures," and "rate elements."  Id. at 6462–63 ¶ 30.  After describing line items as a "rate element," the Commission reasoned that the prohibition or requirement of line items "directly affect[s] the manner in which the [wireless service provider] structures its rates."  Id. at 6463 ¶¶ 30–31.

The Commission distinguished the ability of the states to mandate or prohibit line items from the ability to impose taxes, state universal service support charges, and other disclosure laws, which the Commission left undisturbed.  Id. at 6464–65 ¶¶ 32–33.  The Commission explained that "requiring or prohibiting the use of line items" has a "direct effect" on the ability of wireless service providers to structure rates, but other state regulations have an "indirect effect . . . on a company's behavior."  Id. at 6466 ¶ 34 (quoting Wireless Consumers Alliance Order, 15 F.C.C.R. 17,021, 17,034 ¶ 23 (2000)).  The Commission stated that it "may not always be clear" whether line item regulation is preempted by section 332(c)(3)(A), and it was necessary to look to the "substance, [and] not merely the form of the line item."  Id.

The Commission premised its decision to preempt state regulation on "the pro-competitive, deregulatory framework for [wireless service providers] prescribed by Congress." Id. at 6466 ¶ 35. The Commission stated, "Congress has directed that the rate relationships between [wireless service] providers and their customers be governed 'by the mechanisms of the competitive marketplace.'" Id. (quoting Wireless Consumers Alliance Order, 15 F.C.C.R. at 17,032–33 ¶¶ 20–21)). Because wireless service providers "have come to structure their offerings on a national or regional basis," state laws that prohibit or require the use of line items would result in a "patchwork of inconsistent rules" that "conflict[s] with federal policies." Id.

As to the third issue, the Commission solicited comments about "the role of states in regulating billing" and "other truth-in-billing issues." Id. at 6468 ¶ 37. The Commission sought comments about whether other state regulation of billing practices was preempted by the Communications Act. Id. at 6474 ¶ 50. The Commission explained that "limiting state regulation of . . . billing practices [by wireless service providers] . . . will eliminate the inconsistent state regulation that is spreading across the country, making nationwide service more expensive for carriers to provide and raising the cost of service to consumers." Id. at 6475 ¶ 52.

The State Consumer Advocates and the Vermont Board filed petitions for

review of the Order. The State Utility Regulators intervened in support of the Vermont Board. Sprint Nextel and Cingular Wireless, public corporations that provide cellular wireless services, intervened in support of the Commission.

*C. Motions Filed After the Petition for Review*

After the State Consumer Advocates and the Vermont Board petitioned for review of the Order, the Commission moved to dismiss both the petitions of the State Consumer Advocates and the Vermont Board. The Commission argued that the State Consumer Advocates lacked standing to petition for review on behalf of its members because the State Consumer Advocates failed to establish that "at least one of its members meets the minimal Article III prerequisites for standing to sue." The Commission contended that we lacked subject matter jurisdiction to consider the petition of the Vermont Board because it was not a party to the agency proceedings under the Hobbs Act. 28 U.S.C. § 2344. The Carriers supported the motion to dismiss of the Commission.

The Vermont Board responded that it was a "party aggrieved" because it had participated in the proceedings, 28 U.S.C. § 2344, or alternatively, was a party because the Commission "expressly subjected the [the Vermont Board] to its Order." First, the Vermont Board argued that it had participated in the Commission proceedings because it both submitted comments in the first Truth-in-

13

Billing Order, which had the same agency docket number, and sent an ex parte letter to the Commissioners on March 3 that was deemed untimely by the Clerk of the Commission. The Vermont Board moved to correct the administrative record by including the ex parte letter. Second, the Vermont Board argued that even if it had failed to participate in the agency proceedings, it could petition for review because it was "directly bound" by the Order.

The State Consumer Advocates responded that their association has standing to challenge the Order either on behalf of its members or as a consumer of wireless service. The State Consumer Advocates argued that they have associational standing because the members of the State Consumer Advocates are charged by state statutes "to advocate on behalf of consumers." In support of this argument, the State Consumer Advocates submitted affidavits from three individual members of the State Consumer Advocates who are consumers of wireless telecommunications service. The affidavits stated that the preemption Order "will make it difficult to enact . . . new state laws . . . that are necessary to protect wireless customers from unreasonable, misleading, deceptive or illegal line item fees and charges." The State Consumer Advocates attached the affidavit of John Perkins, the President of the State Consumer Advocates, who testified, "NASUCA is itself a consumer of telephone services . . . . All of the monthly bills for service

14

received by [the State Consumer Advocates] contain line items."

In response to these arguments, the Commission moved to withdraw the motion to dismiss the State Consumer Advocates, but continued to move for dismissal of the Vermont Board. The Carriers then submitted their own motion to dismiss the petition of the State Consumer Advocates on the same grounds the Commission had argued in its withdrawn motion. We granted the motion by the Commission to withdraw its motion to dismiss the petition of the State Consumer Advocates, and we ordered that the motions to dismiss the petitions of the State Consumer Advocates and the Vermont Board be carried with the case. The motion of the Vermont Board to correct the administrative record was also carried with the case.

## II. STANDARD OF REVIEW

We review our subject matter jurisdiction de novo. Williams v. Best Buy Co., 269 F.3d 1316, 1319 (11th Cir. 2001). We review whether a party has standing to challenge an order de novo. Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir.), cert. denied, ___ U.S. ___, 126 S. Ct. 377 (2005). We review the authority of the Commission to regulate under the Communications Act based on the standard enunciated in Chevron U.S.A. v. Natural Resource Defense Council, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781 (1984).

15

## III. DISCUSSION

Before we address the petitions for review, we must consider issues about our jurisdiction. We first address whether the Vermont Board is a "party aggrieved" by the Order under the Hobbs Act. 27 U.S.C. § 2344. Because we conclude that the Vermont Board is not a party aggrieved, we next consider whether the State Utility Regulators may continue as intervenors. We then address whether the State Consumer Advocates have standing to petition for review of the Order. After we conclude that the State Consumer Advocates and the State Utility Regulators have standing, we then turn to the merits of the petitions for review: whether section 322(c)(3)(A) expressly preempted the ability of the states to require or prohibit the use of line items by wireless service providers.

*A. The Vermont Board Is Not a "Party Aggrieved" Under the*
*Hobbs Act.*

The Communications Act provides, "Any proceeding to enjoin, set aside, annul, or suspend any order of the [Commission] . . . shall be brought as provided by and in the manner prescribed in" the Hobbs Act. 47 U.S.C. § 407(a). The Hobbs Act vests exclusive jurisdiction in the courts of appeals to "determine the validity of [] all final orders of the [Commission]." 28 U.S.C. § 2342. "Any party aggrieved by the final order may . . . file a petition to review the order . . . ." Id. § 2344. "A 'party aggrieved' is one who participated in the agency proceeding."

16

Ala. Power Co. v. FCC, 311 F.3d 1357, 1366 (11th Cir. 2002). A nonparty to the proceeding of the Commission must file a petition for reconsideration as a condition precedent to judicial review of the Order. 47 U.S.C. § 405(a).

The Vermont Board presents three arguments that it is a "party aggrieved" by the Order. 28 U.S.C. § 2344. First, the Vermont Board contends that, because it participated in the First Report and Order, which shares the same docket number as the Second Report and Order, it has participated in the proceedings. Second, the Vermont Board argues that it is a "party aggrieved" because it submitted an ex parte letter to the members of the Commission, which the Vermont Board alleges was erroneously excluded from the administrative record. As part of this argument, the Vermont Board moves to correct the administrative record by including the ex parte communication. Third, the Vermont Board argues that even if it did not participate in the proceedings, it may challenge the Order because it is subject to the Order and its arguments challenge the authority of the Commission. We address each argument in turn and conclude that each argument fails.

### 1. Participation in the First Report and Order Does Not Render the Vermont Board a "Party Aggrieved."

The Vermont Board argues that the comments it submitted in the proceedings for the First Report and Order confer party status on it to petition for review. Because the docket number for the First Report and Order, Docket No. 98-

17

170, is the same as the Second Report and Order, the Vermont Board argues that it is a "party aggrieved" under the Hobbs Act. We disagree.

The reliance by the Vermont Board on the docket number to argue that it is a "party aggrieved" by the Second Report and Order is misplaced. Under the Hobbs Act, "[a]ny party aggrieved <u>by the final order</u>" may petition for review. 28 U.S.C. § 2344. Although the First and Second Orders and Report share the same docket number, the Hobbs Act confers party status on those who participated in proceedings that led to the Order under review. See <u>Ala. Power Co.</u>, 311 F.3d at 1366.

The Vermont Board is not a "party aggrieved by the final order" because the Vermont Board petitions for review of the Second Report and Order. 28 U.S.C. § 2344. Regardless of the docket number assigned to the proceeding, the Vermont Board had to be a participant in the proceedings that led to the Second Report and Order to be a "party aggrieved." <u>Id.</u> The comments that the Vermont Board submitted in the proceedings that led to the First Report and Order are immaterial: those comments make the Vermont Board a "party aggrieved by" the First Report and Order, but they do not make the Vermont Board a "party aggrieved by" the Second Report and Order. <u>Id.</u>; <u>see</u> <u>Simmons v. ICC</u>, 716 F.2d 40, 45 (D.C. Cir. 1983) (stating that the petitioner was not a "party aggrieved" where the petitioner

18

participated in a proceeding that was "procedurally and substantially independent" from the challenged order).

### 2. The Ex Parte Letter Submitted by the Vermont Board Failed to Comply with Regulations Issued by the Commission.

The Vermont Board also contends that it participated in the Commission proceeding because it submitted an ex parte letter that it asserts was erroneously excluded from the administrative record. The Commission did not include the letter in the administrative record because the Vermont Board electronically submitted notice of the letter during the "Sunshine" period when no communication was allowed with the Commissioners. See 47 C.F.R. 1.1203(a). The Vermont Board moves to correct the administrative record by including the letter. We address the motion filed by the Vermont Board before we consider whether the ex parte letter is sufficient to confer the Vermont Board with party status.

We have discretion to correct the administrative record to "supply any omission from the record or correct a misstatement." Fed. R. App. P. 16(b). An administrative record consists of "the order sought to be reviewed or enforced, the findings or reports on which it is based, and the pleadings, evidence and proceedings before the agency." Fed. R. App. P. 16(a). We may deny a motion to correct the record where, among other reasons, the proffered item does not fall

19

within the definition of the record, see Deukmejian v. Nuclear Regulatory Comm'n, 751 F.2d 1287, 1324 (D.C. Cir. 1984), the proffered item is immaterial or incomplete, Ala. Tissue Ctr. of Univ. of Ala. v. Sullivan, 975 F.2d 373, 376 (7th Cir. 1992), or the agency did not have the opportunity to consider the evidence, see Altawil v. INS, 179 F.3d 791, 792 (9th Cir. 1999).

The regulations of the Commission provide that ex parte presentations are allowed during the permit-but-disclose period of the agency proceeding. 47 C.F.R. § 1.1206(a). Ex parte presentations shall be included in the administrative record if the presentation includes a cover letter and "shall clearly identify the proceeding to which it relates, including the docket number, if any, shall indicate that two copies have been submitted to the Secretary, and must be labeled as an ex parte presentation." 47 C.F.R. § 1.1206(b)(1). To be considered, ex parte communications must comply with these provisions. See id. § 1.1206(a).

The Vermont Board concedes that its electronic submission on March 4 failed to include a cover letter to explain that it provided notice for the March 3 ex parte letter. There was no way for the Commission to discern that the letter electronically filed on March 4 disclosed an ex parte communication that timely had been submitted to the five Commissioners. Because the electronic submission failed to identify that it disclosed an ex parte letter submitted on March 3, it is not

20

properly part of the record that the agency should have included. 47 C.F.R. §

1.1206(b)(1) (stating that the cover letter that provides notice "must be labeled as

an ex parte presentation"); see Deukmejian, 751 F.2d at 1324 ("In discharging their

obligation to monitor agency action, courts review a record compiled by the

agency and containing its rationale and supporting findings . . . ."). The

Commission followed its regulations when it excluded the ex parte letter from the

administrative record.

We deny the motion to supplement the record with the ex parte letter. "We

must give substantial deference to an agency's interpretation of its own

regulations," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct.

2381, 1286 (1994), and the Commission was not "arbitrary and capricious" when it

excluded the letter from the administrative record, 5 U.S.C. § 706(2)(A). The

Vermont Board did not "participate in the proceedings" by submitting the letter.

Ala. Power Co., 311 F.3d at 1366.

### 3. No Exception Exists to Allow the Vermont Board to Petition for Review of the Order.

The Vermont Board alternatively argues that, even if it did not participate in

the proceedings, it is a party entitled to petition for review of the Order for two

reasons. First, the Vermont Board contends that it is a "party aggrieved" because it

is subject to the Order. Second, the Vermont Board argues that "party status is not

21

. . . required when the agency has acted beyond its authority."

The argument that the Vermont Board may petition for review because it is subject to the Order fails because the Vermont Board misunderstands the scope of our jurisdiction. The Hobbs Act confers the courts of appeals with subject matter jurisdiction to review the orders of administrative agencies. "Since petitioners were never parties to the rulemaking proceedings, this court simply does not have jurisdiction over their claim." Gage v. U.S. Atomic Energy Comm'n, 479 F.2d 1214, 1218 (D.C. Cir. 1973). The cases cited by the Vermont Board are inapposite because they involve the extension of personal jurisdiction, Gilchrist v. Gen. Elec. Cap. Corp., 262 F.3d 295, 300–01 (4th Cir. 2001), R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 955 (4th Cir. 1999), or the relaxation of prudential standing requirements, Devlin v. Scardalletti, 536 U.S. 1, 7–8, 122 S. Ct. 2005, 2009–10 (2002). These cases do not allow a court to expand the statutory grant of subject matter jurisdiction to review an agency decision.

The argument that a petitioner need not be a party when the petitioner challenges the authority of an administrative agency runs contrary to our precedent. We have held that "[a] 'party aggrieved' is one who participated in the agency proceeding." Ala. Power Co., 311 F.3d at 1366. In support of its argument, the Vermont Board cites two decisions from the Fifth Circuit, see Wales Transp., Inc.

22

v. ICC, 728 F.2d 774, 776 n.1 (5th Cir. 1984); Am. Trucking Ass'ns, Inc. v. ICC, 673 F.2d 82, 84 n.4 (5th Cir. 1982), but we are bound by our decision that a petitioner must be a "party aggrieved" without regard to the type of challenge the petitioner seeks to bring. Ala. Power Co., 311 F.3d at 1366; cf. Baros v. Tex. Mexican Ry. Co., 400 F.3d 228, 238 n.24 (5th Cir. 2005) (stating that the exception to party status discussed in American Trucking Ass'ns has been "squarely rejected by some of our sister circuits"); see also Erie-Niagara Rail Steering Comm. v. Surface Transp. Bd., 167 F.3d 111, 112 (2d Cir. 1999) (concluding that the discussion in American Trucking Ass'ns is dictum and Wales Transportation erroneously relied on American Trucking Ass'ns). The Vermont Board is not a "party aggrieved" entitled to petition for review of the Order by the Commission.

We grant the motion by the Commission to dismiss the petition of the Vermont Board. Neither the participation of the Vermont Board in the First Report and Order nor the ex parte letter that was procedurally deficient confer party status on the Vermont Board, and no exception excuses the failure of the Vermont Board to participate in the proceedings of the Commission. We lack jurisdiction to consider the petition filed by the Vermont Board.

*B. The State Utility Regulators May Proceed As an Intervenor.*

23

Although we dismiss the Vermont Board, the State Utility Regulators may continue as an intervenor. "Intervention . . . cannot create jurisdiction if none existed before," 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1917, at 457–58 (2d ed. 1986), but we have discretion to "treat intervention as a separate action, especially when the intervenor has an independent basis for jurisdiction," Atkins v. State Bd. of Educ. of N.C., 418 F.2d 874, 875 (4th Cir. 1969) (per curiam); see 7C Wright, Miller & Kane, Federal Practice and Procedure § 1917, at 458–59; see also Fuller v. Volk, 351 F.2d 323, 328–29 (3d Cir. 1965). Because the State Utility Regulators participated in the proceedings by submitting comments and notice of ex parte communications, the State Utility Regulators have independently established their status as "party aggrieved." 28 U.S.C. § 2344. We exercise our discretion to allow the State Utility Regulators to continue in the petition for review.

### C. The State Consumer Advocates Have Standing to Petition for Review.

The Constitution of the United States limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). The minimum requirements for

24

constitutional standing are "injury in fact," "a causal connection between the injury and the conduct complained of," and that the "injury will be redressed by a favorable decision." Id. at 560–61, 112 S. Ct. at 2136. On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice." Id. at 561, 112 S. Ct. at 2137.

The Carriers move to dismiss the State Consumer Advocates for failure to establish associational standing. The Carriers contend that the State Consumer Advocates cannot establish that at least one of their members has suffered particularized injury and only the member agencies of the State Consumer Advocates have the authority to petition for review. The State Consumer Advocates argue that we need not address this argument because they have standing on an alternative ground.

The State Consumer Advocates argue that they need not rely on associational standing because they are a consumer of wireless telecommunications services that receives bills. The affidavit submitted by the State Consumer Advocates from the President of their organization stated, "NASUCA is itself a consumer of telephone services, both wireline and wireless. It presently has wireline service with Verizon and AT&T and wireless service with Verizon Wireless. All of the monthly bills for service received by NASUCA contain line

25

items."

The State Consumer Advocates have established "general factual allegations of injury resulting from the defendant's conduct." Lujan, 504 U.S. at 561, 112 S. Ct. at 2136. The State Consumer Advocates contend that, because the preemption of the Commission affects the ability of the states to regulate the disclosure of charges on consumer wireless bills, the Order adversely affects the interests of the State Consumer Advocates as a consumer of wireless service. The complaints of the State Consumer Advocates are redressable by granting the petition and vacating the Order of the Commission. That disposition would allow the states to require or prohibit the use of line items by wireless service providers, which the State Consumer Advocates contend would protect consumers from fraud.

The Carriers argue that the State Consumer Advocates may not rely on their status as a consumer of wireless service as a basis for standing because the State Consumer Advocates "chose not to base [their] right to seek review on [their] own receipt of phone bills" in the petition for review. We disagree. When ruling on motions to dismiss for lack of standing, federal courts may consider affidavits and other factual materials in the record. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 881, 110 S. Ct. 3177, 3185 (1990) (considering affidavits submitted in response to a motion for summary judgment to establish standing); FW/PBS, Inc.

26

v. City of Dallas, 493 U.S. 215, 233, 110 S. Ct. 596, 609 (1990), overruled in part on other grounds by City of Littleton v. Z.J. Gifts D-4, LLC, 541 U.S. 774, 124 S. Ct. 2219 (2004) ("[S]tanding . . . must affirmatively appear in the record." (internal quotations and citations omitted) (emphasis added)). Because the State Consumer Advocates have established standing to petition for review as a consumer of wireless service through the affidavit of their President, we deny the motion by the Carriers. We next turn to the merits of the petitions for review filed by the State Utility Regulators and the State Consumer Advocates.

*D. The Commission Exceeded Its Authority When It Preempted State Regulation of Line-Item Billing Under Section 332(c)(3)(A).*

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art VI. "The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368, 106 S. Ct. 1890, 1898 (1986). "[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." Id. at 369, 106 S. Ct. at 1887–88.

"Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has

exceeded his statutory authority or acted arbitrarily." Fid. Fed. Sav. & Loan v. De la Cuesta, 458 U.S. 141, 153–54, 102 S. Ct. 3014, 3022–23 (1982) (quoting United States v. Shimer, 367 U.S. 374, 381–82, 81 S. Ct. 1554, 1560 (1960)). Where a federal agency preempts state law, "the inquiry becomes whether the federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised the legislative power." New York v. FCC, 486 U.S. 57, 68, 108 S. Ct. 1637, 1642 (1988). "Federal regulations have no less pre-emptive effect than federal statutes." Fid. Fed. Sav. & Loan, 458 U.S. at 153, 102 S. Ct. at 3022.

Federal law may preempt state law in three ways. First, express "[p]re-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law." La. Pub. Serv. Comm'n, 476 U.S. at 368, 106 S. Ct. at 1898. Second, conflict preemption occurs "when there is outright or actual conflict between federal and state law." Id. Third, field preemption occurs "where compliance with both federal and state law is in effect physically impossible." Id. "[T]he categories of preemption are not rigidly distinct . . . field pre-emption may be understood as a species of conflict pre-emption." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000); see Caleb Nelson, Preemption, 86 Va. L. Rev. 225, 262 (2000).

28

"'[T]he purpose of Congress is the ultimate touchstone' of pre-emption analysis." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992) (plurality opinion) (quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S. Ct. 1185 (1978)). "[A]ny understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485–86, 116 S. Ct. 2240, 2250 (1996). "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Id. (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S. Ct. 1305 (1977)). Courts interpret the text of the statute and apply traditional cannons of statutory construction to discern the intent of Congress. See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 229, 114 S. Ct. 2223, 2231 (1994); see, e.g., La. Pub. Serv. Comm'n, 476 U.S. at 369, 106 S. Ct. at 1899.

"When we consider issues that arise under the Supremacy Clause . . . , we start with the assumption that the historic police powers of the states are not superseded by federal law unless preemption is the clear and manifest purpose of Congress." Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004). "Although the Constitution makes a few of the federal government's powers exclusive, the states retain concurrent authority over most of the areas in

29

which the federal government can act."  Nelson, supra, at 225.  We accordingly presume that "Congress does not cavalierly pre-empt state[]law."  Medtronic, Inc., 518 U.S. at 485, 116 S. Ct. at 2250.  "[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."  Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S. Ct. 1210, 1217 (1963).  Although the presumption against preemption cannot trump our review of the Order under Chevron, this presumption guides our understanding of the statutory language that preserves the power of the States to regulate "other terms and conditions."  See Smiley v. Citibank, N.A., 517 U.S. 735, 743–44, 116 S. Ct. at 1730, 1735 (1996).  We apply these principles to determine whether Congress granted the Commission authority to preempt the state regulation of line item billing.

In the Second Report and Order, the Commission preempted state regulation of line-item billing based on the express language of the Communications Act.  See 20 F.C.C.R. at 6462–63 ¶ 30, 6466 ¶ 35.  The Commission concluded that the language of section 332(c)(3)(A) of the Communications Act "'prohibit[s] states from prescribing, setting or fixing rates' of wireless service providers."  Id. at 6462

30

¶ 30 (quoting Pittencrief Commc'ns, Inc., 13 F.C.C.R. 1735, 1745 (1997)).  The

Commission explained that "[e]fforts by individual states to regulate [wireless

service providers'] rates through line item requirements . . . would be inconsistent

with the federal policy of a uniform, national and deregulatory framework" of the

Communications Act.  Id. at 6467 ¶ 35.

"When a court reviews an agency's construction of the statute which it

administers, it is confronted with two questions."  Chevron U.S.A., 467 U.S. at

842–43, 104 S. Ct. at 2781.  First, we consider "whether Congress has directly

spoken to the precise question at issue.  If the intent of Congress is clear, . . . the

court, as well as the agency, must give effect to the unambiguously expressed

intent of Congress."  Id.  To determine if "Congress has directly spoken to the

precise question at issue," id., courts interpret the language of the statute and apply

traditional cannons of statutory construction, see MCI Telecomms. Corp., 512 U.S.

at 229, 114 S. Ct. at 2231.  "The construction put on a statute by the agency

charged with administering it is entitled to deference by the courts, and ordinarily

that construction will be affirmed if it has a reasonable basis in law[, b]ut the courts

are the final authorities on issues of statutory construction."  SEC v. Sloan, 436

U.S. 103, 118, 98 S. Ct. 1701, 1712 (1978) (internal citations and quotations

omitted); see also Chevron U.S.A., 467 U.S. at 842–43, 104 S. Ct. at 2781–82.

Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A., 437 U.S. at 843, 104 S. Ct. at 2782 (emphasis added). To determine whether a term within a statute is ambiguous, we consider the context in which the term is used. See MCI Telecomms. Corp., 512 U.S. at 226, 114 S. Ct. at 2229 (explaining that Chevron deference applied because "contextual indications" created ambiguity in the term "modify"). The interpretation of an ambiguous statute by an administrative agency is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Id. at 843–44, 104 S. Ct. at 2782. "Unexplained inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., ___ U.S. ___, 125 S. Ct. 2688, 2699 (June 27, 2005).

The Commission premised the preemption of state regulation of line item billing on the language of section 332(c)(3)(A). That provision states that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A). The Commission found that

32

"Congress did not specifically define 'rates,' 'entry,' or other key terms in section 332(c)(3)(A)," but explained that "rate regulation extends to regulation of 'rate levels and 'rate structures' for" wireless service providers. Second Report and Order, 20 F.C.C.R. at 6462–63 ¶ 30 (citing Sw. Bell Mobile Sys., Inc., 14 F.C.C.R. 19,898, 19,906–07 ¶¶ 18–20(1999)). The Commission reasoned that the "type of state regulations in question reveals that many directly affect [wireless service providers'] rates and rate structures in a manner that amounts to rate regulation." Id. at 6463 ¶ 31. We disagree with this reasoning.

The language of section 332(c)(3)(A) unambiguously preserved the ability of the States to regulate the use of line items in cellular wireless bills. Although the term "rates charged" is not defined in the Communications Act, the meaning of this term is clear in this context. A straightforward reading of the complementary phrases "regulate entry of or the rates charged" and "other terms and conditions," 47 U.S.C. § 332(c)(3)(A), evidences the "clear and manifest purpose of Congress" to leave the regulation of line items to the states, Cliff, 363 F.3d at 1122.

A "rate," as defined by the Oxford English Dictionary, is "[t]he amount of a charge or payment . . . having relation to some other amount or basis of calculation." Oxford English Dictionary (2d ed. 1989). Other dictionaries define a "rate" as "[a]n amount paid or charged for a good or service," Black's Law

33

Dictionary 1268 (7th ed. 1999), or "a charge per unit of a public-service commodity," Merriam-Webster Online Dictionary, available at www.m-w.com/cgi-bin/dictionary (last visited June 27, 2006). "[A]s a basic rule of statutory interpretation, we read the statute using the normal meanings of its words." Horton Homes, Inc. v. United States, 357 F.3d 1209, 1211 (11th Cir. 2004) (quoting Consol. Bank, N.A. v. Dep't of Treas. 118 F.3d 1461, 1463 (11th Cir. 1997)). "In the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" Walters v. Metro. Ed. Enters., Inc., 519 U.S. 202, 207, 117 S. Ct. 660, 664 (1997) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388, 113 S. Ct. 1489, 1494 (1993)).

The prohibition or requirement of a line item affects the presentation of the charge on the user's bill, but it does not affect the amount that a user is charged for service. State regulations of line items regulate the billing practices of cellular wireless providers, not the charges that are imposed on the consumer. Because the presentation of line items on a bill is not a "charge or payment" for service, Oxford English Dictionary (2d ed. 1989), it is an "other term or condition" regulable by the states, 47 U.S.C. § 332(c)(3)(A).

The Commission argues that the Second Report and Order is consistent with

34

its previous decisions because the prohibition or requirement of line items "directly affect[s] [wireless service providers'] rates and rate structures in a manner that amounts to rate regulation." Second Report and Order, 20 F.C.C.R. at 6463 ¶ 31. According to the Commission, section 332(c)(3)(A) prohibits the state regulation of "rate structures" and "rate levels." Id. at 6462–63 ¶ 30. The Commission contends that state regulation of the use of line items "directly intrudes upon the carrier's ability to set rates and establish rate structures for [wireless] service." This argument fails.

In the Second Report and Order, the Commission failed to follow the common definition of "rates" employed in its previous decisions. The Commission has stated that "'rate' is defined in the dictionary as an 'amount of payment or charge based on some other amount.'" Sw. Bell Mobile Sys., Inc., 14 F.C.C.R. at 19,901 ¶ 19. The Commission has also ruled that the phrase "rates charged" "'prohibit[s] states from prescribing, setting or fixing rates' of wireless service providers." Cellular Telecomms. Indus. Ass'n v. FCC, 168 F.3d 1332, 1336 (D.C. Cir. 1999) (quoting Pittencrieff Commc'ns., Inc., 13 F.C.C.R. 1735, 1745 ¶ 20 (1997)).

Until now, the Commission has consistently applied the distinction between "rates" and "other terms and conditions" to interpret whether a regulation amounts

35

to rate regulation under section 332(c)(3)(A). 47 U.S.C. § 322(c)(3)(A). The Commission has concluded that the states may not regulate the method by which wireless service providers calculate the length of a call because it affects "which services to charge for and how much to charge for these services." Sw. Bell Mobile Sys., Inc., 14 F.C.C.R. at 19,898 ¶ 1. Consistent with the distinction of "rates" and "other terms and conditions," the Commission has permitted the states to require wireless service providers "to contribute to state universal service mechanisms." Pittencrieff, 13 F.C.C.R. at 1741 ¶ 13. A universal service mechanism is a charge imposed by state or federal law on providers of telephone service "to make communications services available to all Americans at affordable rates." Cellular Telecomms. Indus. Ass'n, 168 F.3d at 1334. Even though universal service charges have an "impact on the rates charged" to consumers, the Commission concluded that "universal service contribution requirement is not, within the plain meaning of the statute, a rate or entry regulation." Pittencrieff, 13 F.C.C.R. at 1742 ¶¶ 15, 16. Both decisions by the Commission follow the definition of "rates" in the dictionary as a "charge or a payment."

The Commission, by contrast, has defined a line item on a bill as something for which "a consumer receives no tangible product." First Report and Order, 14 F.C.C.R. at 7531 ¶ 61. According to the definitions espoused by the Commission,

a line item is not a rate because "line-item charges cannot be attributed to individual tangible articles of commerce," id. at 7531 ¶ 61, but "a 'rate' has no significance without the element of service for which it applies," Sw. Bell Mobile Sys., Inc., 14 F.C.C.R. at 19,901 ¶ 19.  The Commission asserts that the state regulation of line items affects "rate structures," but these regulations do not require a carrier to recover nor prohibit a carrier from recovering a particular cost. These regulations pertain only to the presentation of that cost on customer bills.

The Commission also failed adequately to explain its conclusion that a line item falls within the definition of "rates" because the use of line items has an alleged direct effect on rates.  In the Second Report and Order, the Commission explained that "requiring or prohibiting the use of line items" has a "direct effect" on the ability of wireless service providers to structure rates, but other state regulations have an "indirect effect . . . on a company's behavior."  Second Report and Order, 20 F.C.C.R. at 6466 ¶ 34 (quoting Wireless Consumers Alliance Order, 15 F.C.C.R. 17,021, 17,034 ¶ 23 (2000)).  The Commission requested further comments because it "recognize[s] that the line between prohibited and permissible state regulations of line items may not always be clear."  Id. (internal quotations and citations omitted).  The attempt by the Commission to distinguish the regulation of line items on cellular wireless bills from the imposition of universal

37

service charges is unavailing.

That the prohibition or requirement of a line item has some effect on the charge to the consumer does not necessarily place a regulation within the meaning of "rates" and outside the ambit of state regulation of "other terms and conditions." The Commission argues that rate regulation includes the regulation of "rate structures" and "rate levels," id. at 6463 ¶ 31, but rate levels and rate structures are still components of "rates." The inclusion of the specific components "rate levels" or "rate structures" within the general term "rates" does not magically expand the authority of the Commission beyond what the statutory language allows.

The Commission has disavowed the argument that a regulation with some effect on prices is per se rate regulation under section 322(c)(3)(A). The Commission, for example, has upheld state regulations that require wireless service providers to contribute to the state-wide universal service fund as an "other term or condition." Pittencrieff, 13 F.C.C.R. at 1742 ¶¶ 42–43, aff'd sub nom. Cellular Telecomms. Indus. Ass'n, 168 F.3d at 1332. The Commission, in Pittencrieff, expressly rejected the argument that the imposition of a universal service fee was rate regulation because it "impacts the rates that a [wireless service] provider charges its customers." Id. at 1745 ¶ 20. The Commission stated, "The Commission has found the 'rates charged by' language to prohibit states from

38

prescribing, setting, or fixing rates of [wireless service] providers. We have not found, however, that it preempts state authority over matters which may have an impact on the costs of doing business for a [wireless service] operator." Id. (footnotes omitted). "To equate state action that may increase the cost of doing business with rate regulation would . . . forbid nearly all forms of state regulation, a result at odds with the 'other terms and conditions' portion of the first sentence." Cellular Telecomms. Indus. Ass'n, 168 F.3d at 1336, aff'g Pittencrieff, 13 F.C.C.R. 1735. If the imposition of a universal service charge has an "indirect" relationship with rates that places it within the purview of "other terms and conditions," then requiring or prohibiting the use of line items has an even more attenuated relationship with rates.

We can discern no logical distinction between what the Commission terms a "direct effect" caused by the regulation of line items and the alleged "indirect effect" caused by the imposition of universal service charges. Second Report and Order, 20 F.C.C.R. at 6466 ¶ 34. The Commission fails to explain why the imposition of universal service charges, which increases the amount a consumer is charged, is more attenuated to the amount a consumer pays for service than the regulation of line items, which affects the presentation of matters on a bill. The Commission is unable to articulate a logical distinction between these two

39

outcomes.

The Commission also contends that the Second Report and Order "is consistent with prior Commission statements equating 'line items' with 'rate elements.'" Second Report and Order, 20 F.C.C.R. at 6463 ¶ 30 & n.83. In support of this argument, the Commission relies on its decision in Federal-State Joint Board of Universal Service, 17 F.C.C.R. 24,952 (2002). In that decision, the Commission ruled that incumbent local exchange carriers may "recover their federal universal service contributions costs through a separate line item" as long as carriers do not "include[] a mark-up above the relevant contribution factor." Id. at 24,970 ¶ 31.

This argument fails for at least two reasons. First, Federal-State Joint Board is inapposite because the authority of the Commission to regulate federal universal service contribution derives from section 254(d) of the Communications Act, not section 332(c)(3)(A). The decision in Federal-State Joint Board does not govern whether the regulation of line items by the states is preempted under section 332(c)(3)(A). Compare 47 U.S.C. § 254(d) (granting the Commission authority to impose federal universal service charges), with id. § 332(c)(3)(A) (granting the Commission authority to regulate "entry" and "rates"). Second, although the Commission stated in Federal-State Joint Board that a federal universal service

contribution is a "rate element" which may be recovered through a line item, id. at 24,979 ¶ 53 n.133, the Commission did not equate the imposition of the universal service contribution with the presentation of the universal service contribution on the bill. Federal-State Joint Board does not equate "line items" with "rate elements."

In the Second Report and Order, the Commission also misconstrued the legislative history of section 332(c)(3)(A). See Second Report and Order, 20 F.C.C.R. at 6464 ¶ 32. The House Committee Report regarding section 332(c)(3)(A) explained that "other terms and conditions" of wireless service, which are regulated by the states, "include such matters as customer billing information and practices and billing disputes and other consumer protection matters." H.R. Rep. No. 103-111, at 211 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 588. Because "our sole concern is the intent of Congress . . . , it is necessary to look to the administrative and legislative background of the enactment." United States v. Zacks, 375 U.S. 59, 62, 84 S. Ct. 178, 180 (1963). Contrary to the argument of the Commission, the legislative history shows that Congress intended to leave the authority to regulate line items with the states.

The Commission dismisses this statement from the legislative history as unpersuasive because it "nowhere suggests that states may regulate rates in the

41

guise of regulating billing practices." The Commission explains that although "not all regulation relating to a carrier's billing and its relationship with customers represents preempted 'rate regulation,'" state regulations that require or prohibit line items are regulation. Second Report and Order, 20 F.C.C.R. at 6464 ¶ 33. The Commission counsels that we should look to the "substance, not merely the form" of the regulation to determine if it has a direct effect on rates. Id. at 6466 ¶ 34 (quoting Wireless Consumers Alliance Order, 15 F.C.C.R. at 17,037 ¶ 28).

This argument is flawed for at least two reasons. First, the Second Report and Order belies the contention by the Commission that line items are not a "billing practice." In the Order, the Commission expressly classifies the use of line items as a "billing practice." Id. Second, although we agree that the "substance, not merely the form" of a regulation governs whether it is rate regulation, id., the Commission does not articulate the "substance" that distinguishes whether a regulation of line items is a billing practice or rate regulation. The prohibition or requirement of the use of line items on wireless bills involves "billing information and practice," not "rates."

The interpretation of the term "rates" urged by the Commission deprives the complementary phrase "other terms and conditions" of all meaning. 47 U.S.C. § 332(c)(3)(A). "It is a cardinal principle of statutory construction that a statute

ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449 (2001). If the presentation of line items on consumer bills were a matter of "rates" and not an "other term[] or condition[]" of wireless service, then the Commission would be free to preempt virtually any form of state regulation of wireless service, including laws regarding disclosure and consumer protection. 47 U.S.C. § 332(c)(3)(A). Under the interpretation of the Commission, even powers historically retained by the states, such as the imposition of state taxes, would be preempted so long as they impact "how carriers recover [the] costs of doing business." Cf. Dows v. City of Chicago, 78 U.S. (11 Wall.) 108, 110 (1871) ("[T]he modes adopted to enforce the taxes levied [by the states] should be interfered with as little as possible."). The failure of the Commission to delineate the proper scope of rate regulation allows the Commission indefinitely to expand its authority without regard to the mandate by Congress that "other terms and conditions" remain the realm of state regulation. 47 U.S.C. § 332(c)(3)(A).

The interpretation by the Commission that the prohibition or requirement of line items is expressly preempted by the language of section 332(c)(3)(A) is not supported by the common definition of "rates." A "rate," as defined in the

43

dictionary and previous decisions by the Commission, is "[t]he amount of a charge or payment." Oxford English Dictionary (2d ed. 1989); see Sw. Bell Mobile Sys., Inc., 14 F.C.C.R. at 19,901 ¶ 19.  Because the regulation of line-item billing is not rate regulation, the express language of section 332(c)(3)(A) of the Communications Act does not preempt state regulations that require or prohibit the use of line items on cellular wireless bills.

## IV. CONCLUSION

We **GRANT** the motion to dismiss the petition of the Vermont Board for lack of subject matter jurisdiction.  We **DENY** the motion by the Vermont Board to correct the administrative record.  We also **DENY** the motion by the Carriers to dismiss the petition of the State Consumer Advocates for lack of standing. Because the Communications Act allows the states to regulate line item billing for wireless services, we **GRANT** the petitions for review filed by the State Consumer Advocates and the State Utility Regulators and **VACATE** the Second Report and Order.