RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0307p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

MARK LEYSE,

        *Plaintiff-Appellant,*

    *v.*

No. 10-3739

CLEAR CHANNEL BROADCASTING INC.;
CLEAR CHANNEL COMMUNICATIONS, INC.;
CRITICAL MASS MEDIA, INC.,

        *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 09-00237—Sandra S. Beckwith, District Judge.

Argued: October 5, 2011

Decided and Filed: September 6, 2012

Before: KEITH, GRIFFIN, and STRANCH, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Stephen R. Felson, Cincinnati, Ohio, for Appellant. Judith A. Archer, FULBRIGHT & JAWORSKI L.L.P., New York, New York, for Appellees. **ON BRIEF:** Stephen R. Felson, Cincinnati, Ohio, for Appellant. Judith A. Archer, FULBRIGHT & JAWORSKI L.L.P., New York, New York, Richard M. Goehler, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellees.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. Mark Leyse received a prerecorded telemarketing call from a Clear Channel radio station. He sued Clear Channel for violating the Telephone Consumer Protection Act of 1991 (TCPA), Pub. L. No. 102-243, 105 Stat. 2394 (1991), which prohibits certain prerecorded telemarketing calls. The

1

district court dismissed the action, finding that the Federal Communications Commission (FCC) had issued regulations exempting the type of call at issue from the TCPA's prohibitions; that the FCC was authorized by Congress to do so; that the court should defer to the resulting regulation under *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984); and that the regulation passed muster under *Chevron*.

On appeal, in addition to arguing over what deference the resulting regulation is due and whether the regulation binds the court under that level of deference, Clear Channel argues that the Hobbs Act deprives this court of subject-matter jurisdiction. Because we conclude that *Chevron* deference applies to the regulation, that the regulation is valid under *Chevron*, and that jurisdiction exists, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In June 2005, a radio station owned by Clear Channel called Leyse's residential telephone number and delivered the following prerecorded message:

> Hi, this is Al "Bernie" Bernstein from 106.7 Lite FM. In case your favorite station went away, I want to take just a minute to remind you about the best variety of yesterday and today at 106.7. Motown, classic 70s from James Taylor, Elton, and Carole King; it's all here. Each weekday, we kick off the workday with an hour of continuous, commercial-free music. This week, when the music stops at 9:20, be the tenth caller at 1-800-222-1067. Tell us the name of the Motown song we played during that hour, and you'll win one thousand dollars. Easy money. And the best variety from 106.7 Lite FM.

Leyse filed a class-action complaint that same month against the defendants (collectively, "Clear Channel") in the United States District Court for the Southern District of New York, alleging that the prerecorded telephone call violated the TCPA, 47 U.S.C. § 227(b)(1)(B), and the corresponding regulation 47 C.F.R. § 64.1200(a)(2). The New York district court granted Clear Channel's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure because the court concluded that the FCC had exempted the type of call at issue from the TCPA's prohibitions against prerecorded calls. *Leyse v. Clear Channel Broad., Inc.*, No. 05 CV

6031 HB, 2006 WL 23480 (S.D.N.Y. Jan. 5, 2006). And the court held that the FCC's determination was entitled to deference under *Chevron* because Congress expressly authorized the FCC to "implement and create exemptions to § 227" and because the exemptions created under this authority were promulgated after notice-and-comment rulemaking. *Id.* at *3.

Leyse appealed to the Second Circuit. During the appeal, the FCC submitted a letter responding to questions posed by the Second Circuit in which the FCC confirmed that the call at issue did not violate § 227 because the FCC had exempted such calls. But the Second Circuit did not consider the merits because it dismissed the action without prejudice for lack of subject-matter jurisdiction. *Leyse v. Clear Channel Broad., Inc.*, 301 F. App'x 20, 21-22 (2d Cir. 2008).

In April 2009, Leyse filed the present action in Ohio. This action is materially identical to the New York action. In May 2009, Clear Channel filed a motion to dismiss for failure to state a claim and the district court granted that motion in June 2010. The court concluded that the FCC had exempted the type of call at issue here, a "hybrid call" that both announces a contest and promotes the station generally. And the court accorded *Chevron* deference to the FCC's decision to exempt the call, reasoning that Congress expressly delegated to the FCC the power to decide what calls to exempt, that the FCC exercised this power through "notice-and-comment rulemaking procedures in the 2003 and 2005 Orders," and that the FCC had consistently articulated its position.[1]

Leyse timely appealed the district court's decision.

## II. ANALYSIS

### A.     Standard of review

We review the district court's decision to grant a motion to dismiss de novo. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009).

---

[1]The court also correctly held that the jurisdictional defect seized on by the Second Circuit no longer existed because of a rule set forth in an intervening Supreme Court opinion. This holding is not challenged on appeal.

**B.        Scope of the FCC's rule**

Leyse argues that the prerecorded call he received lies outside the category of calls the FCC exempted from the TCPA's prohibitions.  We disagree.

The TCPA (codified in relevant part at 47 U.S.C. § 227) regulates telemarketing. Congress found that telemarketing was pervasive and that "[u]nrestricted telemarketing . . . can be an invasion of privacy."  TCPA §§ 2(1), 2(5).  Federal law was therefore needed to balance "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade . . . in a way that protects the privacy of individuals and permits legitimate telemarketing practices."  *Id.* § 2(9).  And Congress explicitly found that the "Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance to privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment."  *Id.* § 2(13).

The TCPA's provisions prohibiting prerecorded calls—which also exempt certain prerecorded calls from that prohibition—provide, in relevant part, as follows:

(b)  Restrictions on the use of automated telephone equipment

        (1) Prohibitions

It shall be unlawful for any person within the United States . . .

. . . .

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, *unless the call is . . . exempted by rule or order by the Commission under paragraph (2)(B)*;

. . . .

(2) Regulations; exemptions and other provisions

The *Commission shall prescribe regulations* to implement the requirements of this subsection.  In implementing the requirements of this subsection, *the Commission--*

. . . .

(B) *may, by rule or order, exempt from the requirements of paragraph (1)(B)* of this subsection, subject to such conditions as the Commission may prescribe--

. . . .

(ii) such classes or categories of calls made for commercial purposes as the Commission determines--

(I) will not adversely affect the privacy rights that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement.[2]

47 U.S.C. § 227(b)(1), (b)(2) (emphasis added). So in § 227(b)(2), Congress expressly (1) mandates that the FCC prescribe regulations to implement the subsection, and (2) gives the FCC the power to exempt prerecorded, commercial calls from the general prohibition on prerecorded calls to a residential phone line.

In 1992, the FCC began and completed the notice-and-comment "rulemaking mandated by the statute," in which it, among other things, "define[d] the contours of statutorily permissible exemptions to the prohibitions of the statute." *Notice of Proposed Rulemaking*, 7 FCC Rcd. 2736, ¶ 1 (Apr. 17, 1992) (hereinafter 1992 NPRM); *accord in re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, ¶¶ 2-5 (Oct. 16, 1992) (hereinafter 1992 Report and Order). The FCC exempted prerecorded calls "that [are] made for a commercial purpose but do[] not include the transmission of any unsolicited advertisement."[3] 47 C.F.R. § 64.1200(c)(2) (1992); *accord* 1992 Report and Order ¶ 5, Appendix B. In formulating this rule, the

---

[2]An *unsolicited advertisement* is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

[3]The FCC's definition of *unsolicited advertisement* is materially identical to Congress's definition in § 227. *Compare* 47 U.S.C. § 227, *with* 47 C.F.R. § 64.1200(f)(5) (1992).

FCC reasoned that "[s]ome messages, albeit commercial in nature, do not seek to sell a product or service and do not tread heavily upon privacy concerns." 1992 NPRM ¶ 11.

In April 2000, a member of the public, Robert Biggerstaff, asked the FCC to clarify its exemption decision in several respects, including how it applied to prerecorded calls from television and radio stations. Biggerstaff noted that television and radio stations use recorded messages to solicit consumers to tune into their broadcasts. He argued that these prerecorded calls should not be exempt from § 227(b)'s prohibitions, reasoning that radio and TV stations are commercial entertainment "services" and make money from the viewers even if the consumer is not paying the station directly for the "service," and the viewers receive advertising when they tune in.

The FCC addressed Biggerstaff's request along with many other matters in its new notice-and-comment rulemaking that began in 2002 and was completed in 2003. *Notice of Proposed Rulemaking*, 17 FCC Rcd. 17459, ¶¶ 1, 13, n.122 (Sept. 18, 2002) (hereinafter 2002 NPRM); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (July 3, 2003) (hereinafter 2003 Report and Order). The FCC's decision to reevaluate these rules, which entails public input, was related to heightened privacy concerns prompted by advances in technology, changes in telemarketing practices, and increases in the amount of telemarketing. 2002 NPRM ¶¶ 1, 7, 11.

The FCC specifically sought comment on issues surrounding "prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or some similar opportunity." *Id.* at ¶ 13. The footnote following this sentence referenced Biggerstaff's request for clarification. *Id*. at ¶ 13 n.122. More broadly, the FCC asked whether these kinds of prerecorded calls needed to be specifically addressed and what kinds of rules would strike the appropriate balance between "consumers' interest in restricting unsolicited advertising with commercial freedoms of speech?" *Id.* at ¶ 13.

Commenters addressing this question divided into two camps that both framed the issue broadly.

A number of commenters, including litigants and attorneys for litigants in TCPA cases, expressed the views that calls from broadcasters are inherently commercial because such calls are intended to increase the station's audience to become more attractive to advertisers. For example, one commenter argued that calls "need not offer something for sale to nonetheless still have advertised the commercial availability or quality of a product or service[.]"

Broadcasters took the opposite tack. The National Association of Broadcasters (NAB) argued that "free over-the-air radio and television broadcasts are not consumer products or services that are bought and sold in commercial transactions. Instead, over-the-air radio and television broadcasts are sources of news, information and entertainment programming that are by federal mandate available for free to every person within a station's listening or viewing area." Thus, according to the NAB, broadcast programming is "not 'commercially' available to listeners and viewers," and therefore "concepts of 'commercial' availability or quality simply have no applicability to the programming that broadcasters transmit over the public airwaves." [The NAB therefore concluded that] "broadcast audience invitation calls, which do not seek to sell a product or service, are not advertisements."

(FCC Letter at 3-4, *Leyse v. Clear Channel Broad., Inc.*, No. 1:09-CV-237 (S.D. Ohio June 2, 2010), ECF No. 8-6 (citations omitted).)

The FCC sided with the NAB in the resulting 2003 Report and Order, stating that

[t]he Commission sought comment on prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or similar opportunity. . . . Few commenters in this proceeding described either receiving such messages or that they were particularly problematic. The few commenters who addressed the issue were split on whether such messages fall within the TCPA's definition of "unsolicited advertisement" and are thus subject to the restrictions on their delivery. We conclude that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the current rules as a commercial call that "does not include the transmission of any unsolicited advertisement" and under the amended rules as "a commercial call that does not include or introduce an unsolicited advertisement or constitute a telephone solicitation." The Commission reiterates, however, that messages that are part of an overall marketing campaign to encourage the purchase of goods or services or

that describe the commercial availability or quality of any goods or services, are "advertisements" as defined by the TCPA.

2003 Report and Order ¶ 145 (footnotes omitted). The FCC did distinguish between messages that invite a consumer to listen to or view a free broadcast and "messages that encourage consumers to listen to or watch programming . . . for which the consumer must pay (e.g. cable, digital satellite, etc.), [which] would be considered advertisements for purposes of our rules." *Id.* at ¶ 145 n.499.

In April 2005, the FCC issued its final rule, reaffirming its position exempting prerecorded calls that invited a "consumer to listen to and or view a broadcast" from § 227(b)'s prohibition. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 70 Fed. Reg. 19, 330-01, 19, 335 (Apr. 13, 2005) (hereinafter 2005 Final Rule). This final rule was promulgated through notice-and-comment rulemaking in which the FCC considered comments, applications for reconsideration, oppositions, and replies. *Id.* at 19, 330-32. In fact, the FCC denied a petition for reconsideration from Biggerstaff that challenged—for essentially the same reasons advanced in his request for clarification in 2000—the FCC decision to exempt broadcaster prerecorded calls. *Id.* at 19, 336.

The FCC has even opined that the exact call at issue in this case—which it characterizes as a "hybrid call that both announces a contest and contains a general promotion for the station"—is exempt and therefore permissible under the TCPA. (FCC Letter at 6-9.) The FCC argues that the "2003 TCPA Order makes clear that neither telephone messages containing general promotional announcements for broadcast stations nor messages inviting the recipient to listen to specific broadcasts are 'unsolicited advertisements.' Both are thus permitted under the rules." (*Id.* at 7.) The key principle underlying the FCC's conclusion is "the idea that over-the-air broadcasts inherently are not commercial." (*Id.* at 8.) That principle underlies the distinction the FCC drew between an "over-the-air broadcast and a paid-for service" because that principle is the

only rationale that explains why the Commission treated differently two telephone messages concerning the same programming: a telemarketing message that promotes a free broadcast show is deemed not to address the commercial availability or quality of the programming (and is within the Commission's statutory discretion to exempt it from TCPA restrictions), but a promotion for programming—even the very same programming—provided by a paid-for service is deemed a commercial advertisement that is barred under the statute. . . . In light of that rationale, it follows directly that the exemption covers both specific and general promotions for broadcast programming provided without charge to the listener.

(*Id.*)

In the face of the three consistent positions taken by the FCC—the 2003 Report and Order, the 2005 Final Rule, and the FCC Letter—Leyse argues that the FCC exemption decision does not extend to the call he received because that call promoted a broadcast *and* the radio station generally, but the exemption in his view covers calls promoting *only* a broadcast. Although a promotion for a broadcast is distinguishable from a promotion for a station, this distinction is trivial. Broadcasts appear on stations and by promoting a broadcast, the promoters are also impliedly promoting the station on which that broadcast appears. But even if the distinction Leyse draws were meaningful, the key principle underlying the exemption extends to calls promoting specific broadcasts or a radio station generally or both. Leyse's argument therefore fails. The FCC has decided to exempt this type of phone call from § 227(b)'s prohibitions.

**C.      The role of *Chevron* deference**

The next step in the analysis is to decide whether the FCC's decision to exempt this phone call should be given deference under *Chevron*. For the reasons that follow, we conclude that the FCC's decision is entitled to *Chevron* deference.

An "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v.*

*Mead Corp.*, 533 U.S. 218, 226-27 (2001). "[A] very good indicat[ion]" that Congress delegated authority to the agency is express congressional authorization to engage in notice-and-comment rulemaking. *Id.* at 229-30. "Thus, the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking . . . ." *Id.* at 230. Put another way, if Congress explicitly leaves gaps in the statutory scheme for the agency to fill, then Congress has expressly delegated "'authority to the agency to elucidate a specific provision of the statute by regulation.'" *Id.* at 227 (quoting *Chevron*, 467 U.S. at 844). "[A]nd any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.*

The present case possesses the factors that the Supreme Court finds significant in granting *Chevron* deference. Section 227(b)(2)—which, among other things, sets forth the types of prerecorded calls that regulation could exempt from the TCPA's prohibitions—authorizes and requires the FCC to promulgate implementing regulations: "The Commission shall prescribe regulations to implement the requirements of this subsection." And § 227(b)(2)(B) authorizes the FCC, "by rule or order, [to] exempt from the [prohibition regarding prerecorded calls] . . . such classes or categories of calls made for commercial purposes as the Commission determines (I) will not adversely affect . . . privacy rights . . . ; and (II) do not include the transmission of any unsolicited advertisement." Therefore, the statute both explicitly leaves gaps for the FCC to fill and authorizes and requires the FCC to engage in notice-and-comment rulemaking. Congress also made clear through its statutory findings that it envisioned a large role for the FCC in crafting rules that strike the appropriate balance between protecting consumers' privacy and permitting legitimate telemarketing:

> While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

TCPA § 2(13); *accord* TCPA § 2(9). In sum, the statute is replete with evidence that Congress intended the FCC to promulgate rules carrying the force of law that determine what kinds of prerecorded calls are permissible and what kinds are not.

And the FCC was similarly clear that it was exercising that authority in promulgating rules through notice-and-comment rulemaking. The FCC issued Notices of Proposed Rulemaking in 1992 and 2002; received and considered comments, requests for clarification, and petitions for reconsideration; and completed its rulemaking in Orders and a Final Rule that set forth the basis for its determination. *See* 5 U.S.C. § 553(b)-(e) (setting forth the requirements for notice-and-comment rulemaking, among other things). Because Congress intended the FCC to set forth legally binding rules governing which prerecorded calls are permissible, and because the FCC's exemption decision was promulgated in the exercise of that authority, that decision qualifies for *Chevron* deference. *See Mead*, 533 U.S. 226-27.

The Supreme Court's decision in *AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), supports this conclusion. There, the Court extended *Chevron* deference to an analogous FCC determination involving the Telecommunications Act of 1996 (1996 Act), which fundamentally restructured local telephone markets to foster competition. *Id.* at 371, 387. One method used was to require sharing of networks by, for example, requiring a local exchange carrier (LEC) to provide unbundled access to the elements of its network for lease by competitors. *Id.* at 371, 375. The FCC was authorized—but not required—to promulgate rules implementing the local-competition provisions and did so by issuing a notice of proposed rulemaking followed by a Report and Order. *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, ¶¶ 6, 9, 10 (1996) (hereinafter First Report & Order); *Iowa Util. Bd.*, 525 U.S. at 373-74, 377.

The primary rule implementing the 1996 Act's requirement of unbundled access to network elements was Rule 319, codified at 47 C.F.R. § 51.319 (1997).[4] *Iowa Util.*

---

[4]The 1997 version of this rule is attached to the First Report & Order and can be seen at 11 FCC Rcd. 16209-13.

*Bd.*, 525 U.S. at 375. Among other things, Rule 319 "sets forth a minimum number of network elements that [LECs] must make available to [competitors]." *Id.* Several LECs argued that Rule 319 was inconsistent with the statute because it included "items that do not (as they must) meet the statutory definition of 'network element'—namely, operator services and directory assistance, operational support systems (OSS), and vertical switching functions such as caller I.D., call forwarding, and call waiting." *Id.* at 386 (citing 47 C.F.R. §§ 51.319(f)-(g) (1997); First Report & Order ¶ 413). But the Court granted the FCC's interpretation of the statutory definition *Chevron* deference and upheld the entire interpretation—including the interpretation relating to vertical switching functions— as "eminently reasonable." *Id.* at 387.

In so holding, the Court granted *Chevron* deference to an FCC determination that appeared only in the Report and Order. Rule 319 contained the FCC's determination that operator services, directory assistance, and OSS fell within the meaning of *network element* in the statute. 47 C.F.R. § 51.319(f)-(g) (1997). But the FCC's similar determination that vertical switching functions fell within that same term appeared in only ¶ 413 of the First Report & Order. *Compare* First Report & Order ¶ 413, *with* 47 C.F.R. § 51.319 (1997). This explains why the Court cited both 47 C.F.R. § 51.319(f)-(g) and First Report & Order ¶ 413 when discussing the items (i.e., operators services, OSS, vertical switching functions) in dispute. *See Iowa Util. Bd.*, 525 U.S. at 386.

While the similarities between *Iowa Utilities Board* and the present case strongly support applying *Chevron* deference to the FCC's exemption decision, the small differences between the cases compel applying *Chevron* deference to that decision. In other words, the present case is an even better candidate for *Chevron* deference than *Iowa Utilities Board* is. First, the similarities. Statutes in both cases authorized the FCC to promulgate implementing regulations. *Compare id.* at 377-78 (reasoning that section 201(b), an amendment to the Communications Act of 1934, authorized the FCC to promulgate necessary rules), *with* 47 U.S.C. § 227(b)(2). The FCC in both cases exercised this statutory authority through notice-and-comment rulemaking. And the

respective FCC determinations at issue—i.e., the determination that vertical switching functions fell within the meaning of *network element* in *Iowa Utilities Board*, and the determination in the present case that the challenged prerecorded call was exempted—were contained in a Report and Order.

Now, the differences. The FCC in the present case is required—not just authorized—to promulgate regulations governing exemptions: "The Commission *shall prescribe regulations* to implement the requirements of this subsection." 47 U.S.C. § 227(b)(2) (emphasis added). And § 227(b)(2) is both specifically tailored to the issue at hand (exemptions) and is contained in the very statute that is being interpreted (the TCPA). In contrast, the statute authorizing regulations in *Iowa Utilities Board* is not tailored to any specific issue in the 1996 Act—let alone the relevant issue of unbundled access. *Iowa Util. Bd.*, 525 U.S. at 377-78. The statute instead is a general one passed in 1938 that authorizes the FCC to promulgate regulations "as may be necessary in the public interest." *Id.* at 377. Another difference is that the TCPA explicitly leaves gaps for the agency to fill, and one gap relates to the specific exemption at issue: § 227(b)(2)(B) authorizes the FCC, "by rule or order, [to] exempt from the [prohibition regarding prerecorded calls] . . . such classes or categories of calls made for commercial purposes as the Commission determines (I) will not adversely affect . . . privacy rights . . . ; and (II) do not include the transmission of any unsolicited advertisement." The statute in the present case, therefore, expressly delegates to the FCC the authority to determine the critical issue to an even greater extent than the statute in *Iowa Utilities Board*. Because the Supreme Court extended *Chevron* deference to the FCC's determination in that case, it follows by even stronger force of logic that *Chevron* deference applies to the FCC's determination here.

Leyse argues that *Chevron* deference does not apply because the FCC's exemption decision is an interpretive rule instead of a legislative rule.[5] A fundamental

---

[5]One prominent difference between legislative and interpretive rules is that only the former requires agencies to use notice-and-comment rulemaking to adopt them. 1 Richard J. Pierce, *Administrative Law Treatise* § 6.4, 433 (5th ed. 2010); *see* 5 U.S.C. § 553(b)-(d).

flaw with this argument is that even if Leyse is correct that the FCC's decision was an interpretive rule, *Chevron* deference would still apply. *Mead* held that an

> administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

533 U.S. at 226-27. So the key inquiry is whether Congress delegated the necessary authority, not whether the rule is termed interpretive or legislative. The necessary authority was unquestionably delegated here. As discussed above, Congress expressly delegated authority to the FCC to make exemption decisions carrying the force of the law. 47 U.S.C. § 227(b)(2) (requiring rulemaking and explicitly leaving gaps for the FCC to fill in § 227(b)(2)(B)). And the FCC exercised that authority by crafting the exemption decision through notice-and-comment rulemaking. 2002 NPRM; 2003 Report and Order; 2005 Final Rule. The FCC's decision is therefore entitled to *Chevron* deference under *Mead*.[6]

Leyse attempts to escape this conclusion by arguing that the FCC's exemption decision was not a logical outgrowth of the 2002 NPRM. Final rules adopted through notice-and-comment rulemaking "must be a logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (internal quotation marks omitted). That principle stems from 5 U.S.C. § 553(b)(3), which requires an agency engaged in "notice-and-comment rulemaking to publish in its notice of proposed

---

[6]Other language in *Mead* is not to the contrary. First, the remark in *Mead* that "interpretive rules . . . enjoy no *Chevron* status *as a class*" simply relates the truism that not all interpretive rules qualify for *Chevron* status. *Mead*, 533 U.S. at 232 (emphasis added). That remark does not foreclose the possibility that an interpretive rule could receive *Chevron* deference. Indeed, this circuit has applied *Chevron* deference to an interpretive rule. *Your Home Visiting Nurse Servs., Inc. v. Sec'y of Health & Human Servs.*, 132 F.3d 1135, 1138-39 (6th Cir. 1997). And *Mead* reasoned that even nonlegislative rules such as interpretive rules that are not adopted through notice-and-comment rulemaking can receive *Chevron* deference: "[A]s significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." *Mead*, 533 U.S. at 230-31. The present case, of course, involves rules promulgated through notice and comment.

rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Id.* (quoting 5 U.S.C. § 553(b)(3)). The logical-outgrowth rule is used to ensure that § 553(b)(3)'s object—fair notice—is satisfied. *Id.*

The 2002 NPRM stated, among other things, the following:

> [W]e also seek comment on prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or some similar opportunity. Does the Commission need to specifically address these kinds of telemarketing calls, and, if so, what rules might we adopt to appropriately balance consumers' interest in restricting unsolicited advertising with commercial freedoms of speech?

2002 NPRM ¶ 32. Prerecorded calls from broadcasters that encourage consumers to tune in at a particular time for a chance to win a prize obviously invite the consumer to tune into the broadcast occurring at that time. The FCC was providing notice that it was considering calls that promoted broadcasts, and more generally, stations themselves, since calls promoting broadcasts also promote the stations those broadcasts appear on. In the 2005 Final Rule, the FCC "concluded that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the rules as a commercial call that does not include or introduce an unsolicited advertisement or constitute a telephone solicitation." 2005 Final Rule at 19, 335 (internal quotation marks omitted). This final rule flows logically from the 2002 NPRM.

Moreover, several commenters—including at least three and possibly four individuals who, like Leyse, believed that prerecorded calls promoting a station violated the TCPA—responded to the broader issue of whether calls inviting consumers to tune into broadcasts or stations are prohibited under the TCPA. 2003 Report and Order ¶ 145 n.498 (summarizing comments). And comments that address the issue resolved in the Final Rule provide evidence that the notice was adequate. *See Ne. Md. Waste Disposal Auth. v. Envtl. Prot. Agency*, 358 F.3d 936, 952 (D.C. Cir. 2004). Because fair notice was provided, the FCC's exemption decision was a logical outgrowth of the proposed rule. The notice-and-comment rulemaking, therefore, was valid and the FCC decision resulting from that rulemaking is entitled to *Chevron* deference.

**D.    Applying *Chevron* deference**

Having determined that the FCC's rule that permits the call is entitled to *Chevron* deference, we now must apply *Chevron* to decide whether that rule binds this court. We conclude that it does.

Applying *Chevron*, we must first determine "whether Congress has directly spoken to the precise question at hand." *Chevron*, 467 U.S. at 843. Congress has not. Rather than address the type of prerecorded call at issue in this case, § 227(b)(2)(B) explicitly leaves it to the FCC to determine which, if any, of those types of calls will be permissible.

The second and final step under *Chevron* requires that we defer to the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. As discussed above, the FCC's exemption decision lies comfortably within the statutory scheme and is thus not manifestly contrary to the statute. An agency's interpretation is "arbitrary and capricious" when

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007) (quoting *Motor Vehicles Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Despite Leyse's many attempts to show that the FCC's decision is arbitrary and capricious, the record here does not support that finding. In reaching its exemption decision, the FCC considered the impact on privacy rights. *See* 2003 Report and Order ¶¶ 1, 136; 2002 NPRM ¶ 30. For example, the FCC noted that "[f]ew commenters in this proceeding described either receiving such messages or that they were particularly problematic." 2003 Report and Order ¶ 145. And the fact that Leyse and other commenters disagree with the result the FCC reached does not detract from the deference accorded to the agency because the FCC considered and rejected these

perspectives during its rulemaking. 2003 Report and Order ¶ 145 n.497-99; (FCC Letter at 3-5).

## E.        The Hobbs Act

Clear Channel contends that the Hobbs Act[7] and 47 U.S.C. § 402(a) operate together to deprive the district court below and this court on appeal of jurisdiction to consider Leyse's lawsuit under the TCPA. In Clear Channel's view, Leyse's lawsuit is an impermissible collateral attack on the FCC's decision to permit the challenged call and others like it. The FCC agreed with this position in its letter to the Second Circuit.

Since this issue turns on statutory interpretation, the "starting point . . . is the language of the statute itself." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) (citation and internal quotation marks omitted). If the statutory language is unambiguous, the "plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (citation, internal quotation marks, and brackets omitted).

The Hobbs Act provides in part that "[t]he court of appeals . . . has *exclusive* jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the Federal Communications Commission *made reviewable by section 402(a) of title 47*." 28 U.S.C. § 2342(1) (emphasis added). Section 402(a) provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter . . . shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28 [i.e., the Hobbs Act]."[8]  47 U.S.C. § 402(a).

---

[7]Chapter 158 of title 28, codified at 28 U.S.C. §§ 2341 to 2351.

[8]The parties dispute whether the FCC's exemption decision is an *order* within the meaning of these statutes. We resolve the jurisdictional issue on an alternative basis, obviating the need to resolve this dispute.

The key phrase of § 2342 in the present case—*made reviewable by section 402(a) of title 47*—limits the grant of exclusive jurisdiction to FCC orders that are reviewable under § 402(a). And to be reviewable under § 402(a), the case must be a "proceeding to enjoin, set aside, annul, or suspend" an order of the FCC (hereafter, "a proceeding to enjoin or annul an FCC order"). A case that is not a proceeding to enjoin or annul an FCC order lies outside the ambit of § 2342(1).

This court has consistently interpreted § 2342(1) as reaching an action only if the action's central object is to either enforce or undercut an FCC order. The most analogous case is *United States v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658 (6th Cir. 2000) ("*Maquina Musical*").[9] *Maquina Musical* involved a government action in district court that sought the forfeiture of broadcasting equipment used by the unlicensed microbroadcaster Maquina Musical. *Id.* at 663, 666-68. Under applicable law, the government could seize broadcasting equipment that was knowingly used to broadcast without a license. *Id.* at 666. Maquina Musical argued in defense that 47 C.F.R. § 73.512(c)—an FCC regulation that effectively barred new microbroadcasting licenses from being issued—"was an unconstitutional prior restraint on speech." *Id.* at 662, 666-67. But the district court held "that it lacked jurisdiction to entertain Maquina Musical's constitutional defenses because 28 U.S.C. § 2342 provides that the courts of appeals have exclusive jurisdiction 'to enjoin, set aside, suspend . . . or to determine the validity of . . . all final orders of the [FCC].'" *Id.* at 667.

This court disagreed with that holding "for the simple reason that no FCC order is being challenged." *Id.* In addition, the court expressed concern with a statutory scheme that would allow the government to seize Maquina Musical's property while simultaneously denying Maquina Musical the ability to contest the "legal basis of the government's forfeiture case." *Id.* As this court explained in a later case, "[i]n [*Maquina Musical*], no FCC order was issued against the unlicensed microbroadcaster.

---

[9]Our precedent refers to this as the *Strawcutter* case after Strawcutter, a party in the case. But the analysis in that case most relevant to the present case occurs in the section involving the situation of Maquina Musical, another party to that case. Moreover, the parties refer to the case as *Maquina Musical*. We therefore do the same.

Instead, the FCC went directly to the district court and instituted an in rem forfeiture action against the broadcaster. The broadcaster had no other forum in which to present his constitutional defenses." *United States v. Szoka*, 260 F.3d 516, 528 (6th Cir. 2001).

*Maquina Musical* demonstrates that § 2342(1) reaches an action and therefore mandates exclusive jurisdiction in the court of appeals only if the action's central object is to either enforce or undercut an FCC order. The statement that "no FCC order is being challenged" makes little sense at first blush because Maquina Musical challenged the constitutionality of 47 C.F.R. § 73.512(c), *Maquina Musical*, 204 F.3d at 666-67, and courts have held that agency regulations constitute *orders* for purposes of § 402(a) and § 2342, *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 416-21 (1942); *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 345-47 (1st Cir. 2004). But the FCC's forfeiture action was not based on this—or any—order. *See Maquina Musical*, 204 F.3d at 663, 666-67; *La Voz Radio De La Communidad v. FCC*, 223 F.3d 313, 319-20 (6th Cir. 2000); *Szoka*, 260 F.3d at 527-28. Consequently, the action's central object was not to enforce or undercut an FCC order; rather, the central object was to seize Maquina Musical's property. Just because Maquina Musical argued in defense that an FCC regulation was unconstitutional does not change the purpose of the action.

The understanding that § 2342(1) reaches an action only if the action's central object is to either enforce or undercut an FCC order was furthered by the next Sixth Circuit case to address this question, *La Voz*. *La Voz* also involved an unlicensed microbroadcaster, but this time, the microbroadcaster (La Voz) applied for a license and the FCC returned the application because it was "grossly deficient." *La Voz*, 223 F.3d at 316. A few months later, La Voz filed a complaint against the FCC District Director, seeking to enjoin the government from preventing La Voz from broadcasting its message and from sanctioning La Voz either criminally or civilly. *Id.* at 317. La Voz also argued that the FCC's regulation barring the issuance of broadcast licenses to microbroadcasters was unconstitutional. *Id.* at 315-16, 318. The government moved to dismiss for lack of jurisdiction and the district court agreed. *Id.*

We upheld that determination on appeal, distinguishing the case from *Maquina Musical* and reasoning that the case involved an FCC order because the FCC had denied La Voz's license application. *Id.* at 318-20. When La Voz filed its complaint, which was "essentially a claim for prospective relief against the FCC," the action's central object was to undercut an FCC order (the license denial), thereby "disregard[ing] Congress's directive that review of the FCC's administrative actions should occur in the courts of appeals (and, in many cases, specifically in the District of Columbia Circuit)." *Id.* at 320. In *Maquina Musical*, the forfeiture action itself involved no FCC order because the letters the FCC sent Maquina Musical "demanding that they stop broadcasting . . . were not *orders* to cease and desist" and because "the microbroadcasters in [*Maquina Musical*] had never applied for broadcasting licenses." *Id.* at 319-20 (emphasis added). In both *La Voz* and *Maquina Musical*, the microbroadcasters argued that the FCC regulations barring the issuance of broadcast licenses to microbroadcasters were unconstitutional, but the district court had jurisdiction to consider that argument only in *Maquina Musical*. This is so because the action's central object in *La Voz* was to undercut the FCC's denial of La Voz's license by enjoining the FCC's attempts to prevent La Voz from broadcasting, while the action's central object in *Maquina Musical* was to seize property, not to attack or enforce an FCC order.

*Szoka* reinforces the same principle. The FCC in that case obtained a valid cease-and-desist order against an unlicensed broadcaster. *Szoka*, 260 F.3d at 520. In unsuccessfully resisting that order, Szoka argued that the "FCC regulations prohibiting the licensing of low-power radio stations violated the First Amendment." *Id.* Szoka then appealed that order to the District of Columbia Circuit as required by 47 U.S.C. § 402(b)(7). *Id.* But because he refused to stop broadcasting even after the FCC obtained the cease-and-desist order, the FCC filed an action in district court, successfully obtaining an injunction preventing him from broadcasting. *Id.* at 521. During that proceeding, the district court expressed skepticism about the FCC's ban on low-power broadcasting, but concluded that it lacked jurisdiction to consider these claims because

the D.C. Circuit had exclusive jurisdiction to hear them in Szoka's appeal of the cease-and-desist order itself.  *Id.*

> On appeal of the district court's injunction, Szoka argued that the
>
> district court erred when it refused to consider Szoka's constitutional defenses to the government's motion for an injunction. Szoka argued to the district court and continues to argue on appeal that the FCC's former ban on microradio broadcasters is unconstitutional because it violates the First Amendment. As a result, he claims that the FCC cannot seek an injunction enforcing its cease and desist order.

*Id.* at 525.  We affirmed the judgment of the district court, holding that there was no jurisdiction in the injunction proceeding or the resulting appeal to consider Szoka's constitutionality arguments.  *Id.* at 526-28.

The court's analysis—which again is explained by the principle that § 2342(1) reaches an action only if the action's central object is to either enforce or undercut an FCC order—is the most thorough and clear of the three Sixth Circuit cases on point and is worth quoting at length:

> While the circumstances of this case differ from those of *La Voz*, the controlling legal principles do not.  *La Voz* emphasized that when . . . the FCC institutes an in rem forfeiture action—and not an administrative action—against a microbroadcaster, the broadcaster can raise and the district court can consider constitutional defenses.  However, if the FCC institutes administrative proceedings, such as the issuance of a cease and desist order, against a microbroadcaster, the microbroadcaster must pursue his constitutional claims through the means given by Congress, which is the administrative process undertaken by the FCC and its review in the D.C. Circuit.  Just as the plaintiff in *La Voz* could not use a constitutional claim as a sword to launch a preemptive strike against the FCC, so too is Szoka unable to use his constitutional claim as a shield in defense against the FCC's motion for an injunction enforcing the cease and desist order. . . .
>
> This result allows Szoka to raise his constitutional defenses within the scheme contemplated by the Communications Act.  In [*Maquina Musical*], *no FCC order was issued against the unlicensed microbroadcaster*.  Instead, the FCC went directly to the district court and instituted an in rem forfeiture action against the broadcaster.  The broadcaster had no other forum in which to present his constitutional

> defenses. In this case, however, an FCC order was issued against Szoka, mandating that he cease and desist from broadcasting without a license. Szoka had the opportunity to raise his constitutional defenses in the course of the administrative action undertaken by the FCC. The FCC considered all of Szoka's constitutional defenses and rejected them. Szoka can raise his constitutional defenses once more in his appeal of the cease and desist order to the D.C. Circuit. *There was no need for the district court to address Szoka's constitutional arguments, because he was able to raise them in other proceedings.*

*Id.* at 527-28 (emphasis added). The italicized language makes it clear that although Maquina Musical challenged the constitutionality of the FCC regulations—an order under the Hobbs Act and § 402, *Columbia Broad. Sys.*, 316 U.S. at 416-21; *Citizens Awareness Network*, 391 F.3d at 345-47—that order preexisted the microbroadcaster-FCC dispute and was not an order issued against that specific microbroadcaster. *Szoka*, 260 F.3d at 528. The action's central object (forfeiture of Maquina Musical's property) was neither to enforce nor undercut an FCC order, so the microbroadcaster's constitutional objections could be considered. But the action's central object in *Szoka* was to enforce the FCC cease-and-desist order through an injunction, and the courts addressing the injunction were therefore without jurisdiction to consider these same constitutional arguments.

Applying the principles from these cases to the present case yields the conclusion that we have jurisdiction to consider Leyse's arguments that the FCC's exemption decision should be reversed for a litany of reasons (e.g., the decision is not entitled to deference and is arbitrary and capricious). The central object of Leyse's action is not to enforce or undercut an FCC order; it is to seek damages and an injunction against Clear Channel, a private party, for allegedly violating the TCPA. Clear Channel raised the FCC exemption decision as a defense, and Leyse responded by arguing that the decision is invalid. Leyse's argument is akin to Maquina Musical's constitutional arguments over which we exercised jurisdiction. Moreover, the FCC is not a party to this proceeding, as it was in all three prior cases, so the present case is an even stronger case than *Maquina Musical* for concluding that jurisdiction exists. The presence of the FCC as a

party in the case increases the likelihood that the action could be defined as a proceeding to enjoin or annul an FCC order. *See* 47 U.S.C. § 402(a).

Were we to conclude that the Hobbs Act barred the constitutional defenses, Leyse would be left with "no other forum in which to present his . . . defenses," a problem recognized in *Maquina Musical*. *Szoka*, 260 F.3d at 528. Jurisdiction to appeal under the Hobbs Act "is invoked by filing a petition as provided by section 2344 of this title." 28 U.S.C. § 2342. And § 2344 allows "any *party aggrieved* by the final order" to institute an appeal in a court of appeals if it meets certain criteria. (Emphasis added.) "A 'party aggrieved' is one who participated in the agency proceeding. A nonparty to the proceeding of the Commission must file a petition for reconsideration as a condition precedent to judicial review of the Order." *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238, 1247 (11th Cir. 2006), *modified on other grounds on denial of reh'g*, 468 F.3d 1272 (11th Cir. 2006). Leyse, like Maquina Musical, is not a party aggrieved.

Clear Channel cites precedent in other circuits that have reached the opposite result. But these cases are not controlling and none of them focus on the phrase *made reviewable by section 402(a) of title 47* that appears in § 2342. *E.g.*, *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443 (7th Cir. 2011). This language provides a specific requirement that the action must be reviewable under § 402(a), which limits review to "[a]ny proceeding to enjoin, set aside, annul, or suspend any order" of the FCC. This lawsuit does not fit the mold of a proceeding to enjoin or annul an order of the FCC. Rather, it is a lawsuit for damages and injunction against a large media company in which an order of the FCC is raised as a defense by the media company.

In addition, the principle that harmonizes our three controlling cases is fully consistent with the Supreme Court case on point, *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 465 (1984). In that case, ITT and other companies involved in providing overseas telecommunications filed a rulemaking petition seeking to prevent the FCC from negotiating with foreign governments in a series of meetings called the Consultative Process that sought to encourage competition in telecommunications

services.  The petition claimed that such negotiations were beyond the FCC's authority. *Id.*  After the FCC denied the petition, the companies appealed to the District of Columbia Circuit.  *Id*. at 466.  ITT then sued the FCC directly in federal district court, arguing that the FCC had no authority to negotiate at the Consultative Process and seeking to enjoin that practice.  *Id.* at 466-67.  The district court dismissed that count as beyond its jurisdiction in accordance with the Hobbs Act, but the D.C. Circuit reversed. *Id.*

> On appeal, the Supreme Court held that
>
> [e]xclusive jurisdiction for review of final FCC orders, such as the FCC's denial of respondents' rulemaking petition, lies in the Court of Appeals. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a).  Litigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order. . . . In substance, the complaint filed in the District Court raised the same issues and sought to enforce the same restrictions upon agency conduct as did the petition for rulemaking that was denied by the FCC.

*Id.* at 468.  The Court also reasoned that the "gravamen of both the judicial complaint and the petition for rulemaking was to require the agency to conduct future sessions on the terms that ITT proposed."  *Id.* at 468 n.5.  So the Court held that § 2342(1) reached an action (ITT's lawsuit in federal court) when the action's central object was to undercut an FCC order (the FCC's denial of the telecommunication companies' rulemaking petition).  *Id*. at 468-69.  Other factors are present in *ITT World* that comport with our analysis: the FCC itself was a party to the lawsuit—a factor favoring application of the Hobbs Act; and, an FCC order had issued directly against the party making the challenged arguments—a factor that *Szoka* noted placed the arguments beyond the federal court's jurisdiction to consider.  Our interpretation of § 2342 and § 402(a) therefore fits comfortably within the parameters of *ITT World*.  Moreover, *ITT World* does not provide support for cases that have expanded the reach of § 2342(1) beyond this interpretive principle.  *See CE Design*, 606 F.3d at 448-50 (extending the reach of § 2342(1) to an action in which the FCC was not a party, the action's central object was not to enforce or undercut an FCC order, and no FCC order had issued

against the party making the arguments that the court concluded were beyond its jurisdiction).[10]

Thus, based on our precedent and in accordance with the analysis of *ITT World*, we find that the Hobbs Act does not deprive the district court below or this court on appeal of jurisdiction over Leyse's lawsuit.

### III. CONCLUSION

For the above reasons, we **AFFIRM** the judgment of the district court.

---

[10]Clear Channel's observation that *Maquina Musical* relied on Eighth Circuit precedent that was later reversed on rehearing does not undermine these conclusions. *Szoka* explicitly noted that *Maquina Musical* relied on a case that was later reversed on rehearing. 260 F.3d at 529 n.11. But far from retreating from the position staked out by *Maquina Musical*, the court in *Szoka* expanded on the principles first articulated in this circuit in that case. *Id.* at 526-28.